UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 3:11-CR-132 JD |
| | ) |
| CHRISTOPHER PETER | ) |

<u>MEMORANDUM OPINION AND ORDER</u>

Now before the Court is Christopher Peter's motion to suppress evidence seized when state law enforcement officers executed a search warrant at his Mishawaka, Indiana, residence [DE 15]. Counsel for Mr. Peter and the government have presented argument and evidence in both initial [DE 16, 21, 22] and supplemental briefs [DE 28, 29], as well as at an evidentiary hearing in court [DE 26]. Mr. Peter contends that the search warrant in this case was based on unlawfully obtained evidence—a warrantless intrusion onto his front porch and rear yard to conduct a dog sniff—and that the premises described in the warrant exceeded the factual basis in the affidavit. The government responds that dog sniffs are not searches under the Fourth Amendment, that officers were lawfully present on Peter's front porch, and that probable cause to search a residence extends to its garage. For the reasons below, the Court denies the motion to suppress.

## I. BACKGROUND

On April 4, 2011, Indiana State Trooper Daniel Ringer observed a silver Chevrolet Impala drive into the parking lot of Five Point Garden Store in South Bend, Indiana. *See* DE 28-2 at 19. The driver parked, entered the shop, and then exited about a minute later. *Id*. This conduct seemed unusual to Trooper Ringer (although there is no further explanation why), who had worked many marijuana grow operations and knew that suspects purchase grow equipment,

grow media, marijuana seeds, and other such articles at garden stores such as Five Points. *See* DE 16-2 at 5. Trooper Ringer ran the license plate of Peter's vehicle and discovered that Peter owned the car; further checking revealed that Peter had an extensive criminal background (though none of it involved marijuana or other narcotics) and an outstanding arrest warrant out of DuBois County, Indiana, for Forgery. *Id.*

On April 28, at about 9:15 a.m., Trooper Brian Hoffman went to Peter's residence to observe the suspect's vehicle and serve the arrest warrant. *Id.* Hoffman noticed that the house had covered windows on the basement, first, and second levels, and that one of the basement windows had a metal mesh over a portion of it acting as a vent. *Id.* Trooper Hoffman called for assistance, and when backup arrived they approached the front door and rang the door bell, but got no answer. *Id.* Trooper Hoffman heard a noise at the side of the house and saw that Peter had exited the rear door. *Id.* When Peter asked what was going on, Trooper Hoffman explained that they were there to arrest him for Forgery, but that they also suspected that he was growing marijuana. *Id.* When Trooper Hoffman mentioned a grow operation, Peter refused to consent to a search of the home and "became more agitated and defiant." *Id.* While talking to Peter, Trooper Hoffman heard fans running through the vent in the basement window. *Id.* Peter was arrested and taken to St. Joseph County Jail.

At about 10:00 a.m., Trooper Hoffman requested that a K-9 unit be sent to Peter's house, and at approximately 10:30 a.m., Trooper Mick Dockery arrived with Hondo, a certified narcotics-detection dog with (at the time) a 100 percent accuracy rating when detecting narcotics behind closed doors. *See* DE 16-1 at 5; DE 28-2 at 21. Trooper Dockery brought Hondo up the front walk onto the front porch and, with the command "Seek Dope," had the dog conduct a "free air sniff" of the area around the front door of the house. *See* DE 16-1 at 6. Hondo alerted at

the front door. *Id.* Trooper Dockery then led Hondo to the rear door, where the dog also alerted. *Id.*

Based on Hondo's alerts, Trooper Hoffman's observations and experience, and Trooper Ringer's observations a few weeks before, a St. Joseph Superior Court judge issued a search warrant for Peter's residence. *Id.* at 3. The warrant described the premises to be searched, and included the detached garage to the north of the residence. *Id.* Trooper Hoffman returned to Peter's house with several other police officers, including Trooper Ringer and Trooper Hoffman, and proceeded to search the premises. *See* DE 28-2 at 16. In the basement, they smelled the odor of marijuana and found two small plastic bags and a shoe box containing small amounts of green plant material. *Id.* They also found a wooden grinder with plant residue inside, a computer with photographs of several potted plants dated from one year prior, and a "how to" booklet on growing marijuana. *Id.* at 16–17, 18. One of the officers noticed an open area in the ceiling, and discovered a loaded 9 mm handgun between the floor joists. *Id.* at 16. Officers also entered the detached garage, in which they discovered a marijuana grow room with cultivated marijuana plants and grow equipment. *Id.* at 17.

While the police were searching, a tenant in the separate upstairs apartment inquired regarding what was going on. *Id.* at 7. She agreed to Trooper Hoffman's request to talk further, and exited the house through a separate side entrance to her apartment. *Id.* She and her boyfriend rented the upstairs apartment and did not have access to the downstairs apartment, basement, or garage. *Id.* She did not know much about Peter, other than his name, but stated that she and her friends, family, and boyfriend occasionally smelled marijuana from the downstairs apartment. *Id.*

On October 12, 2011, a federal grand jury indicted Peter on charges of manufacturing and possessing with intent to distribute marijuana, as well as possessing a firearm both as an

unlawful user of a controlled substance and a convicted felon, and in furtherance of a drug trafficking crime. *See* DE 1. Peter was arrested just over a week later, arraigned, and released on unsecured bond. *See* DE 7.

At the evidentiary hearing on March 12, the defendant and the government agreed to stipulate to certain facts surrounding the dog sniff and the execution of the search warrant, pertaining to the number of police officers and vehicles present: two officers, Troopers Hoffman and Cook, arrived at approximately 9:15 a.m., one in an unmarked truck and the other in a marked police car. Peter was arrested, and Trooper Cook left. At about 10:30 a.m. Trooper Dockery arrived in a car with lights on top, but without markings, with the dog, Hondo. Only Troopers Hoffman and Dockery were present for the dog sniff, which took about five minutes. Following the dog sniff, at about 11:00 a.m., Trooper Cook returned to watch the house and Troopers Hoffman and Dockery left to obtain a search warrant. About one hour later, at approximately noon, Hoffman and Dockery returned to execute the warrant with three other officers, Troopers Ringer, Mechling, and Lehman. Hoffman and Ringer were wearing civilian clothes, while the other four (including Cook) were in uniform. In total, there were six police officers (four in uniform and two in civilian clothes) and six vehicles (one unmarked, one with only lights, and four marked). The last of the officers left the house about 3:00 p.m. The parties also stipulated to the fact that Trooper Hoffman heard a fan running inside a grated basement window, but did not know whether it was blowing air in or out. They further stipulated that it is not unusual for homes in Mishawaka to have basements that are vented with fans.

The Court then heard testimony from Trooper Dockery, who explained his and Hondo's training and the way that Hondo alerted to the presence of narcotics. Essentially, Hondo is a "passive alert" dog, who is trained to sit and stare at where the odor of narcotics is coming

from—although its also possible that the dog is not actually smelling what is behind the door but odors that people have carried out of the house with them. Dockery testified that as of the date of the sniff of Peter's front door, Hondo was 100 percent accurate at detecting the presence of narcotics behind closed residential doors. Dockery also testified that after he arrived at the residence, he deployed Hondo by walking through one of the gates (he did not remember whether it was closed), up the front walk, and onto the front porch. Hondo alerted on the front door. Dockery and Hondo then proceeded to the rear door, from which Trooper Hoffman had seen Peter emerge earlier. As they passed the garage, Hondo began sniffing aggressively, perhaps indicating that he detected the odor of narcotics. Believing that they lacked reasonable suspicion of a grow operation in the garage, however, Trooper Dockery redirected Hondo to the rear door, at which Hondo also alerted.

Next, mail carrier Timothy Enflied testified about his routine delivery of mail to the front door of Peter's residence. Six days a week for the last three to four years, Enflied has delivered mail on foot to the Mishawaka residence. The chain link fence has been there that entire time, but has never been locked, and Enflied has generally entered the yard through the front gate leading to the porch and delivered the mail to a mail slot by the front door. After delivering Peter's mail, Enfield would walk around the side of the house to deliver mail to the upstairs tenant and then exit the fence through a different gate. He leaves packages on the front porch, as would any other delivery person. He also testified that there are individuals—though not necessarily on his route—who do not want mail carriers to enter their yards and instead put mailboxes on the outside of the fence. Even in those instances, however, carriers will generally deliver packages to the door. In his experience, a mail carrier has automatic permission to go within a fenced yard to deliver mail, especially where the mailbox is located inside the fenced

area. Enflied also testified that he had noticed toys and play furniture on the porch, and agreed that a gated area with children's toys generally indicates a private area. However, he never saw any "keep out" signs, and suggested that, in his opinion, the fence in this case suggested an intent to keep children in the yard, rather than to keep visitors out.

Finally, Peter himself testified. He has lived in the bottom apartment—the main floor and the basement—of the Mishawaka residence since February 2007. The fence surrounding the yard was there when he moved in, but he has always kept the gates closed and, in fact, recalled asking the mail carrier, Mr. Enflied, to make sure he shut the gate. Peter was concerned when the gate was open because he valued his privacy, but also because he had a pool in the back yard at the time. He admitted that there was no lock on the gate and no signs to deter someone from approaching the front door. While guests would generally come to his back door, he agreed that there would not have been any way to know that from observing the house. He stated that the doorbell next to the front door was not in operation, but again agreed that there would be no way for a visitor to know that. He also admitted that lights placed next to the front walk would serve to illuminate the path, but stated that his purpose in putting them there was entirely decorative, as he and guests used the back door to come and go.

## II. ANALYSIS

### A.    Introduction: Outline of the Issues and the Impact of *United States v. Jones*

Peter's basic contention in his motion to suppress is that the warrant that authorized the search of his residence, including his garage, was invalid because the affidavit submitted to the judicial officer was insufficient to sustain the warrant. Because of this, he argues, the search was illegal and the evidence obtained from it should be suppressed. This sounds straightforward

enough, but actually becomes exceedingly complex once the component elements of the basic argument are unpacked. For Peter's argument is not primarily that the facts outlined in the affidavit do not meet the probable cause threshold—that determination is left to the judicial officer issuing the warrant and given great deference, and even a finding that the warrant lacked probable cause does not always justify the exclusion of inculpatory evidence. Rather, Peter argues that the key piece of evidence supporting probable cause—the fact that a dog sniff alerted to the presence of illegal narcotics in the house—was itself obtained illegally. Without this, he contends (correctly), the other facts in the affidavit fell well short of the probable cause threshold.

Until a few months ago, this argument would have required the Court to answer a single underlying question: did Peter have a "reasonable expectation of privacy" in his front porch or the odor of narcotics lingering there or emanating from the front door? *See Katz v. United States*, 389 U.S. 347, 361 (1967); *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002). Establishing this expectation of privacy—which must be both subjectively and objectively reasonable—would be Peter's burden. *See French*, 291 F.3d at 951. After the recent Supreme Court decision in *United States v. Jones*, 132 S.Ct. 945 (2012), however, it is no longer sufficient to focus singularly on Peter's legitimate privacy interests: the Court must also independently consider whether the police trespassed onto Peter's private property "for the purpose of obtaining information." *Id.* at 949. This means that Peter's primary contention really breaks down into three questions. First, does a dog sniff of a home (as opposed to a package or a car) violate a resident's legitimate expectation of privacy and thus constitute a "search" for purposes of the Fourth Amendment and subject to constitutional constraints? Second, were the police officers lawfully present on Peter's front porch when they conducted the dog sniff, or was this

intrusion itself a "search" under the Fourth Amendment? Third, if either the dog sniff or the intrusion onto the front porch do implicate the Fourth Amendment, did the search require a warrant supported by probable cause—or, if not probable cause, at least some exigent circumstances or reasonable suspicion of criminal activity? Finally, and independently of whether the necessary facts in the affidavit were the fruit of an illegal search, Peter argues that the affidavit did not support a search warrant for the garage, since no dog sniff alerted to narcotics in the garage.

**B.      The Dog Sniff itself was not a Fourth Amendment Search**

Peter's first contention is that law enforcement needs some sort of minimal suspicion, if not actual probable cause and a search warrant, before they can perform a dog sniff of a residence. He acknowledges that the Supreme Court has approved warrantless dog sniffs of cars during a traffic stop or checkpoint, and that the Seventh Circuit has extended this to include residential dog sniffs. But he distinguishes the relevant precedent by suggesting that each of those cases limited itself to the specific facts and that no binding precedent has approved the unfettered use of dog sniffs at residences. And he argues that permitting the search in this case, without (in his view) any reasonable suspicion, would allow police to wander residential streets with drug dogs without warrants or particularized suspicion in search of any narcotics evidence. The Court deals with this question first because if the dog sniff itself is a Fourth Amendment search, it must be reasonable regardless of whether the police were lawfully present on Peter's front porch.

As an initial matter, the Court notes that assuming (for now) that the police were lawfully present on Peter's front porch, the dog sniff does not implicate any additional *property* rights. Therefore, the analysis of the dog sniff itself is not affected by *Jones* and need only consider

whether the dog sniff implicated the privacy components of Fourth Amendment protections that descend from *Katz*. As noted above, it is Peter's burden to prove his legitimate expectation of privacy. *See French*, 219 F.3d at 951. "A reasonable expectation of privacy exists when 'the complainant exhibits an actual (subjective) expectation of privacy and, (2) the expectation is one that society is prepared to recognize as reasonable.'" *Id.* (quoting *United States v. Ruth*, 65 F.3d 599, 604 (7th Cir. 1995).

The Supreme Court's first holding regarding dog sniffs came in the context of a warrantless sniff of a traveler's luggage in the airport in *United States v. Place*, 462 U.S. 696 (1983). The Court held that such a sniff was not a search within the meaning of the Fourth Amendment,[1] explaining that "the canine sniff is *sui generis*" and that it knew of "no other investigative procedure that is so limited in both the manner in which the information is obtained and the content of the information revealed." *Id.* at 707. More recently, in *Illinois v. Caballes*, 543 U.S. 405 (2005), the Court reaffirmed *Place* and held that a dog sniff of a vehicle during a traffic stop, without any reasonable suspicion of illegal drug activity, did not violate the Fourth Amendment. *Id.* at 408–09. The Court expanded on the reasoning in *Place*: "Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment'" and because "any interest in possessing contraband cannot be deemed 'legitimate' . . . governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'" *Id.* at 408. In other words, regardless of whether the first (subjective) prong of the reasonable expectation of privacy is met, the second (objective) prong cannot be because society does not recognize a reasonable expectation of privacy in contraband.

---

[1] The Court ultimately held that the 90-minute detention of the luggage *did* violate the Fourth Amendment, but not based on the warrantless dog sniff.

Peter correctly notes that the Supreme Court has never considered whether the rule permitting warrantless dog sniffs of automobiles extends to residences. This may change soon: the Court has granted certiorari on a case out of Florida in which the Florida Supreme Court held that a warrantless dog sniff of a residence is a search within the Fourth Amendment, at least under certain circumstances. See *Jardines v. State*, 73 So. 3d 34 (Fla. 2011), *cert. granted sub nom. Florida v. Jardines*, 132 S.Ct. 995 (2012) (granting certiorari on question of "[w]hether a dog sniff at the front door of a suspected grow house by a trained narcotics detection dog is a Fourth Amendment search requiring probable cause"). But this Court must decide this motion based on current law, not based on a prediction of what the Supreme Court might rule next year.

Supporting Peter's position, the Second Circuit has long held that *Place* does not apply to residences given their uniquely protected status under the Fourth Amendment. *See United States v. Thomas*, 757 F.2d 1359, 1366–67 (2d. Cir. 1985). But the Seventh Circuit (with the majority of the circuits) has not followed this approach, and unless and until the Supreme Court forces a change, this Court is bound by that precedent. In *United States v. Brock*, 417 F.3d 692, 693 (7th Cir. 2005), law enforcement officers executed a search warrant at the defendant's residence and discovered numerous drugs. The defendant was not home at the time, but his next door neighbor was in the residence and explained to police that the defendant also rented a room next door and used the room as a "stash house." *Id.* With the neighbor's consent, the police entered the house next door, located the locked door of the defendant's room, and brought a drug sniffing dog to the door, which alerted to the presence of narcotics. *Id.* The police obtained a search warrant for the bedroom based largely on the dog's alert. *Id.* at 694. The defendant argued that the dog sniff outside his locked bedroom door was an illegal warrantless search and sought to have the evidence from the warrant search of the room suppressed because it relied on the sniff. *Id.* at

695. The district court refused to suppress the evidence and the Seventh Circuit affirmed, holding that "the dog sniff inside [the defendant's] residence was not a Fourth Amendment search because it detected only the presence of contraband and did not provide any information about lawful activity over which [the defendant] had a legitimate expectation of privacy." *Id.* at 696.

Peter attempts to distinguish the controlling precedent on three basic grounds. First, he argues that *Caballes* itself noted the difference between a dog sniff of a legitimately stopped vehicle and the intrusion on a person's home by thermal imaging. 542 U.S. at 409–10 (citing *Kyllo v. United States*, 533 U.S. 27 (2001)). Even if the Supreme Court has given itself room to distinguish residential dog sniffs in the future, however, this Court has no such freedom: as already noted, the Seventh Circuit has clearly extended *Caballes* to dog sniffs of homes. *See Brock*, 417 F.3d at 697. Moreover, *Brock* considered and rejected this very argument (as did the Supreme Court itself in *Caballes*). The holding of *Caballes* did not turn on the distinction between a lawfully stopped vehicle and a residence, but rather on the type of information revealed by a dog sniff versus thermal imaging: a dog sniff reveals *only* the presence or absence of illegal narcotics, whereas thermal imaging may reveal lawful activity "including intimate details in a home, such as 'at what hour each night the lady of the house takes her daily sauna and bath.'" *Caballes*, 543 U.S. at 409–10 (quoting *Kyllo*, 533 U.S. at 38); *Brock*, 417 F.3d at 696. Without further guidance from the Supreme Court, this distinction fails.

Second, Peter argues that the intrusion in this case went beyond a mere dog sniff that detected only illegal activity. He picks up the argument from the Florida Supreme Court in *Jardines*, arguing that the presence of numerous police cars and officers in front of his residence in broad daylight turned this police action into something more than a relatively unobtrusive

sniff of a car within the course of a routine traffic stop. This type of procedure, the *Jardines* court noted, is an "intrusive procedure that may expose the resident to public opprobrium, humiliation and embarrassment" and also raises "the specter of arbitrary and discriminatory application." 73 So. 3d at 49. This second distinction does not succeed either. For one, the encounter in *Brock* was hardly unobtrusive: the police investigation and search of two neighboring houses involved multiple officers; like here, the canine unit was called in after the police discovered the locked bedroom in which they suspected the presence of narcotics. 417 F.3d at 693–94. More importantly, neither Peter nor *Jardines* explain what the number of police officers and cars present at the scene or the risk of public opprobrium have to do with the Fourth Amendment, which protects legitimately held privacy and property rights, not reputations. As one district court recently observed while discussing *Jardines*, "[p]lenty of permissible police conduct may lead to adverse inferences by uninformed members of the public—such as the replication of the facts in *Jardines* but with officers simply knocking on the door and asking questions instead of having a dog." *United States v. Anthony*, Crim. No. 11-68 JBS, 2012 WL 959448, at *6 (D.N.J. Mar. 20, 2012). This Court agrees: while the degree of intrusiveness may be relevant to the reasonableness of the search, there must first be a search: "to read intrusiveness retroactively into the question of whether conduct is a search mis-applies the Fourth Amendment inquiry." *Id.*

Finally, Peter argues that in the Seventh Circuit cases approving warrantless dog sniffs of residences, *United States v. Vasquez*, 909 F.2d 235 (7th Cir. 1990), and *Brock*, the police had additional facts supporting a reasonable suspicion that the defendant was engaged in criminal conduct before the dog sniff. In *Vasquez*, police had observed the defendant for several days and noticed that he repeatedly removed a plastic bag and delivered it to an apartment, and had been

12

told by a confidential informant that the garage had lots of cocaine in it. And in *Brock*, the police were invited into the residence by someone who shared the apartment with the defendant, who also stated that the locked bedroom was a "stash house" and that he had seen the defendant transport methamphetamine between the apartments. *See* DE 28 at 11–12 (citing *Brock*, 417 F.3d 692).

Peter is obviously correct that in *Vasquez* and *Brock* the police had substantially more facts supporting their suspicion of drug crimes. But every case is distinguishable on its facts in some way, and it is the reasoning of the decision that matters: *Vasquez* did not approve the dog sniff of the garage because the police had met some threshold requirement of reasonable suspicion but instead because "a canine sniff test that is used to detect the presence of contraband is not a fourth amendment search." 909 F.2d at 238.[2] Similarly, *Brock* did not rely on the predicate reasonable suspicion of narcotics in the locked bedroom, but rather relied on the Supreme Court's decision in *Caballes* (permitting routine dog sniffs during traffic stops without *any* suspicion of drug activity) to hold that "there is no legitimate interest in possessing" illegal narcotics and that therefore the dog sniff "was not a Fourth Amendment search because it detected only the presence of contraband and did not provide any information about lawful activity over which [the defendant] had a legitimate expectation of privacy." 417 F.3d at 695–96. Thus, while the distinctions Peter draws between this case and *Vasquez* and *Brock* are real, they are irrelevant to the holdings in those cases and do not sustain his position.

In sum, it is firmly established in this circuit that a dog sniff that detects only the

---

[2]As Peter states, *Vasquez* did reserve the question of whether a dog sniff that "is more intrusive *and exposes private information other than the presence of contraband*" requires reasonable suspicion." 909 F.2d at 238 (emphasis added). But that is irrelevant here, because the dog sniff of Peter's front porch revealed no other information other than the presence of marijuana.

presence of illegal narcotics and does not provide any information about lawful activity has no Fourth Amendment significance, and cannot transform otherwise lawful police activity into an unconstitutional search. That is not to say that *every* dog sniff is lawful under the Fourth Amendment, but simply that the presence or absence of a dog sniff does not affect the constitutional analysis. It is still necessary to consider whether the police action in question was otherwise lawful.

**C.      The Police intrusion onto the front porch was a Fourth Amendment search.**

     *1.      Background*

While the precedent clearly teaches that a canine sniff—whether of a suitcase, an automobile, or a residence—is not itself a search within the meaning of the Fourth Amendment and therefore does not require any independent justification, the overall police action is still subject to constitutional constraints. Thus, in *Place*, although the dog sniff of the defendant's luggage did not constitute an unlawful search, the 90-minute detention of that luggage "went beyond the narrow authority possessed by police to detain briefly luggage reasonably suspected to contain narcotics." 462 U.S. at 710. In *Caballes*, the Court "accept[ed] the state court's conclusion that the duration of the stop . . . was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop," and held that the dog sniff did not transform the otherwise lawful traffic stop into an unlawful search. 543 U.S. at 408. And in *Indianapolis v. Edmond*, 531 U.S. 32 (2000), although the use of a drug-detection dog at drug interdiction checkpoints was not a search, the checkpoint program itself was unconstitutional because it was justified neither by road-safety concerns nor individualized suspicion. Similarly, in *Brock*, the Seventh Circuit reiterated that dog sniffs that detected only contraband were insignificant for Fourth Amendment purposes but stressed that "critical to our holding that the dog sniff in this

case was not a Fourth Amendment search is the fact that police were lawfully present inside the common areas of the residence with the consent of Brock's roommate." 417 F.3d at 697.

In this case, Peter's front porch was unquestionably his private property, and the police came onto that property without express consent or a search warrant. As noted above, before the Supreme Court's recent decision in *Jones*, this fact would simply have been one factor among many relevant to determining whether the police action infringed the reasonable expectation of privacy protected by the Fourth Amendment. Although the origins of Fourth Amendment jurisprudence lie in the law of trespass, and at one time its protections were thought to limit only searches of tangible property, the Supreme Court long ago rejected "the premise that property interests control the right of the Government to search and seize" and has developed a more expansive protection for a person's "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 352–53 (1967). Following *Katz*, the prevailing assumption of the courts was that the new privacy-based formulation *replaced* the older property-based one, such that "privacy [came] not merely to supplement but to eclipse property as *the* interest protected by the Fourth Amendment." *United States v. Redmon*, 138 F.3d 1109, 1131 (7th Cir. 1998) (Posner, J., dissenting) (collecting cases). While property rights remained a relevant, even important, consideration in determining Fourth Amendment rights, property's role was "relegated to that of furnishing evidence of the reasonableness of a defendant's expectation of privacy." *Id.*

Whatever basis that assumption had, however, it did not survive the holding in *Jones* that the *Katz* reasonable expectation-of-privacy test *supplemented*, but did not replace, the older understanding that the Fourth Amendment "embod[ies] a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Jones*, 132 S.Ct. at 950. In *Jones*, the defendant sought to suppress evidence obtained from a GPS tracking device

15

installed on the underbody of his Jeep. The Supreme Court declined to consider whether the defendant had any reasonable expectation of privacy in the underbody of his automobile or the location of the vehicle, instead holding that the Government conducted a Fourth Amendment "search" when it "physically occupied private property for the purpose of obtaining information" by "install[ing] a GPS device on a target's vehicle," and "us[ing] that device to monitor the vehicles movements." *Id.* at 949. Given the considerable extent to which the exclusively privacy-based approach to the Fourth Amendment had permeated the jurisprudence between *Katz* and *Jones*, it may take courts years to work out the full ramifications of *Jones*. It is also worth noting that *Jones* was simply concerned with whether the trespass was a search in the first place, but expressly declined to consider whether that search was unreasonable without a warrant because the government waived that argument. What is clear, however, is that discussion of property rights can no longer be relegated to evidence of a reasonable expectation of privacy and must instead be considered as an independent source of Fourth Amendment protections.

In light of *Jones*, therefore, Peter's motion does not depend simply on whether he had a reasonable expectation of privacy in the odor of illicit marijuana plants or even anything that could be seen, heard, or smelt from his front porch—the mere fact that the Government physically occupied his private property is enough to warrant Fourth Amendment scrutiny. Not all police intrusions onto private property implicate the Fourth Amendment, however, and this case implicates two potential exceptions to the general rule that police must obtain a warrant before occupying private property to obtain information. First, the police did not trespass onto Peter's property if they merely "use[d] the route which any visitor to a residence would use for the purpose of making a general inquiry or for some other legitimate reason." *See United States v. French*, 291 F.3d 945, 954 (7th Cir. 2002) (citing *United States v. Evans*, 27 F.3d 1219, 1229

(7th Cir. 1999)). Second, even if the intrusion in this case was a trespass, not all trespasses onto private property are equal from a constitutional perspective, and only if the home itself and its curtilage—the area outside the home that is intimately associated with the activities of home—are considered significant enough to trigger Fourth Amendment protection. *Id.* at 952.

One final note before considering whether the police trespassed on private property protected by the Fourth Amendment: to what extent is the curtilage inquiry really separate from the inquiry into the scope of the implied invitation to the public. The cases have not always treated them distinctly. In *French*, for example, the Seventh Circuit considered the fact that a law enforcement officer was on a walkway "opened for public common use," which was the "route which any visitor to a residence would use," as evidence that the walkway was not within the curtilage of the residence, rather than a separate justification for the officer's presence. *Id.* at 954. Elsewhere, the cases have described the curtilage as the "zone of privacy" surrounding the home, at least implying that an express or implied invitation for members of the public to come onto the property negates this "zone of privacy." *See Redmon*, 138 F.3d at 1112–13 (although well removed from the curb, a garbage can next to the garage was not within the curtilage, in part because the garbage collector collected the trash from that location). As discussed below, however, the use to which a particular area of property is put is an important factor in determining whether the area is curtilage, so it is not strange for courts to consider as relevant to the curtilage inquiry the fact that the public (or a limited segment of it) is permitted to use the portion of the property in question.

Further, under pre-*Jones* assumptions, both inquiries would have simply been evidence of the overarching question of whether the police impinged on a reasonable expectation of privacy. It is only with the re-emergence of the older property-rights basis for Fourth Amendment

protections that somewhat fine distinctions between the questions of whether the police were impliedly invited onto a portion of the property, on the one hand, and whether the portion onto which the police trespassed was curtilage, on the other, are relevant. It is, at the very least, analytically useful to consider the two questions separately: the former asks whether a trespass has occurred in the first place, or whether the police were legitimately on the property; the latter asks whether the trespass (assuming one took place) has Fourth Amendment significance.

> 2. *Police trespassed by exceeding the implied invitation onto the porch.*

While there is no question that the police did not have Peter's express consent to open his gate and walk up to his front porch, such express consent is not always necessary to avoid a trespass. Generally, a postal worker does not trespass when he comes onto private property to deliver mail, nor does a neighbor, solicitor, or political candidate trespass when she approaches the main door of a dwelling to contact the resident for legitimate social or business purposes. This is because the homeowner impliedly invites them to walk up to his front door. *See Redmon*, 138 F.3d at 1130 (citing *Oregon v. Portrey*, 134 Or. App. 460 (1995)). As the Ninth Circuit once explained:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof— whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States*, 327 F.2d 301 (9th Cir. 1964). Thus, "it is not objectionable for an officer to come upon that part of private property opened for public common use and the officer may use the route which any visitor to a residence would use, for the purpose of making a general inquiry or for some other legitimate reason.'" *French*, 291 F.3d at 954.

From the evidentiary hearing, the Court has no difficulty concluding that the front walk and porch were impliedly held open to social and business invitees. While there was a chain-link fence surrounding the property, the gates were not locked and no signs indicated that members of the  public were forbidden from coming through the gates to approach the front door. The postal worker delivered mail to the front porch daily, and other deliveries would have been left there as well. There was a doorbell visible next to the front door, inviting any visitor to come onto the porch to contact the resident. While Peter testified that guests used the side door, and that the doorbell was not connected, he admitted that most members of the public would not have known to use the side rather than the front door.

Thus, the police certainly could have walked up Peter's front walk and onto his porch in order to contact Peter or someone else at the home as part of a general inquiry and as an implied invitee, just as could any social or business visitor. But this case does not appear to fit within any implied invitation. The police had no intention of contacting Peter or anyone else in the residence.  Peter had been arrested some time earlier, and the police did not ring the doorbell or make any attempt to see if there was anyone else in the residence when they brought the drug-sniffing dog onto the front porch. The sole purpose of the intrusion was to gain sufficient probable cause for a search warrant by giving Hondo the opportunity to detect the presence of illegal narcotics. This purpose is unrelated to the resident, so the action here is not analogous to the neighbor, politician, or salesman who comes to the door to communicate with the resident.

According to *French*, the police may also approach the front door for "some other legitimate reason" without implicating the Fourth Amendment. But what does "legitimate reason" mean, and does it cover the police intrusion onto Peter's property in this case, given that they quite clearly did not seek to contact anyone in the home? There is unfortunately very little

case law directly on point, and nothing from the Seventh Circuit, as far as the Court is aware. Logically, it must impose *some* limitation, for if the police could enter an area onto which the public is impliedly invited for any reason or none at all, the final phrase of the *French* test (which is the generally accepted formulation) would be entirely superfluous. If the police could approach Peter's porch for any reason, it would mean that he (and virtually all homeowners, who extend an implicit invitation to social and business invitees to walk up to the front door) would have effectively "waived" his property rights simply by neglecting to place a "no trespassing" sign on his front gate. *See United States v. Redmon*, 138 F.3d 1109, 1130 (7th Cir. 1998) ("[O]ne's right to complain about a trespass does not depend on one's refusing to invite anyone onto any part of his property, for then only hermits (and not all of them) would have property rights." (Posner, J. dissenting)).

Such a result might have made sense if the test of whether a police action is a search under the Fourth Amendment were coextensive with a person's "reasonable expectation of privacy" as expounded in *Katz* and its progeny. For if a property owner allows most members of the public to walk up to his front porch (and therefore see, smell, and hear anything there), what reasonable expectation of privacy can he be said to have? But the Supreme Court's decision in *Jones* teaches (at the very least) that a reasonable expectation of privacy is not absolutely necessary to invoke the protection of the Fourth Amendment when "[t]he Government physically occupie[s] private property for the purpose of obtaining information." *Jones*, 132 S. Ct. at 949. Given that the Fourth Amendment protects not just privacy but also property, the limit to the right of law enforcement to intrude onto private property should be understood in light of the owner's property rights, and not merely his privacy interests.

So there must be *some* limit to the license of police to intrude for "legitimate reasons"

within the curtilage of a home. In *French*, the Seventh Circuit upheld a search warrant based on observations of methamphetamine manufacture made from a gravel walkway that ran from a residence to a shed. 291 F.3d at 954. While the court found that the walkway was not curtilage, it also stressed that "it is clear from the facts in the record that [the probation officer] came to French's property not to conduct a search, but for the *express purpose* of locating an errant probationer who had failed to report." *Id.* However, the court had no reason to address whether entering the curtilage of a residence for the purpose of conducting a search would implicate the Fourth Amendment. *See also, e.g.*, *Estate of Smith v. Marasco*, 318 F.3d 497, 520–21 (3d Cir. 2003) (stating that whether police may proceed to the back of a house in an attempt to contact the resident depends on the circumstances, including the police purpose). But the fact that the police were in no way seeking to contact Peter or any other resident makes our case unique.

The Court is aware of no federal decisions on point and has been able to locate just a single case in which *any* court considered whether law enforcement officers who had no intention of contacting a resident were lawfully present for some "other legitimate reason" on private property that was impliedly opened to the public, such that no Fourth Amendment trespass occurred.[3] In that case, *State v. Ross*, 4 P.3d 130 (Wash. 2000), the Supreme Court of Washington held that "obtain[ing] information to prepare the affidavit in order to obtain a search warrant"—at least late at night "when no reasonably respectful citizen would be welcome absent actual invitation or an emergency"—was not "legitimate business" that authorized the police to

---

[3]At least one state court has stated that "legitimate police business"—whether administrative or investigative, including any good faith, non-pretextual suspicion of criminal activity—is all that is required, but the initial intent of the officer in that case was to contact the resident to investigate criminal activity in the area. *See State v. Cloutier*, 544 A.2d 1277, 1280 (Me. 1988).

come onto publicly accessible areas of the curtilage. *Id.* 313–14.[4]

Some police purposes are clearly legitimate reasons: as discussed, it is generally accepted that law enforcement officers may approach the door of a dwelling to contact the occupant, *see French*, 291 at 954, just as any member of the public would approach the same door to contract the inhabitants for their own social or business purposes. Law enforcement may also approach a front door or porch to serve an arrest warrant or subpoena, or to leave a note for a resident. It is worth noting that law enforcement is not limited to purposes that a property owner would explicitly agree to, if asked: presumably, many people would prefer not to be served with a subpoena or arrested and would politely decline the experience, if offered the chance. The Court need not, however, determine everything that might count as a "legitimate reason," or whether, as *Ross* reasoned, the legitimacy of a proffered reason is affected by circumstances such as the time of day. It is enough to conclude simply that an attempt to obtain information to prepare an affidavit is not, standing alone, a legitimate reason for police to intrude within property otherwise protected by the Fourth Amendment. Under *Jones*, a search occurs when the police "physically occup[y] private property for the purpose of obtaining information." 132 S. Ct. at 949. If "obtaining information" were itself a legitimate reason, the exception would swallow the

---

[4]In that case, the defendant sought to suppress evidence gained with a search warrant that had relied on a warrantless canine sniff of his property. *Id.* at 132–33. At around 8:30 p.m., the police were on the defendant's property in response to an anonymous tip about a marijuana grow operation. *Id.* When they noticed mold and mildew on a garage window, they quickly left but returned just after midnight without any intention to contact the defendant but solely to confirm the smell of marijuana, based on which they obtained a search warrant. *Id.* at 133. The State argued that the area around the garage was easily visible from a walkway leading to the front door, that the path was impliedly open to the public, and that therefore the Fourth Amendment was not implicated as long as the officer stayed on the path and did not use a particularly intrusive method of observing the garage. *Id.* at 310–11. The court upheld a lower court decision suppressing the evidence. It noted that "[a]n officer with legitimate business, when acting in the same manner as a reasonably respectful citizen, is permitted to enter the curtilage areas of a private residence which are impliedly open, such as access routes to a house." *Id.* at 312. But it held that the officers' purpose—"to obtain information to prepare the affidavit in order to obtain a search warrant"—was not a legitimate purpose given the late hour, "when no reasonably respectful citizen would be welcome absent actual invitation or an emergency." *Id.* 313–14.

rule. Thus, whatever else a "legitimate reason" may be, it must be something beyond "obtaining information."

Therefore, although the Court acknowledges the dearth of precedent on this question, the Court holds that the police presence on Peter's front porch for the sole purpose of obtaining evidence to support a search warrant was a trespass. And because that trespass was "for the purpose of obtaining information," it was a search within the meaning of the Fourth Amendment. *Jones*, 132 S. Ct. at 949.

>    *3.    Peter's front porch was within the curtilage of his home.*

If the Court is correct that the police intrusion onto Peter's front porch was a trespass, the question then becomes whether that trespass is relevant for purposes of the Fourth Amendment. Not all trespasses are. The Supreme Court has long distinguished between trespasses to "open fields"—which do violate property rights but have no Fourth Amendment significance—and trespasses within the residence or the area known as the curtilage of the residence. *See United States v. Dunn*, 480 U.S. 294, 300 (1987). The curtilage is defined as "the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home." *United States v. French*, 291 F.3d 945, 952 (7th Cir. 2002).

The Supreme Court has established a four factor inquiry to determine whether an area outside a residence is considered curtilage:

> [1] the proximity of the area claimed to be curtilage to the home,
> [2] whether the area is included within an enclosure surrounding
> the home, [3] the nature of the uses to which the area is put, and
> [4] the steps taken by the resident to protect the area from
> observation by people passing by.

*Dunn*, 480 U.S. at 300–01. These factors are not meant to be a "finely tuned formula" and precisely define the limits of curtilage, but rather a tool to determine "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301. The *Dunn* factors point in different directions in this case, and the question is a close one, but on balance the Court concludes that the front porch—if not the entire fenced yard—is within the curtilage of Peter's home.

*First*, the porch is immediately adjacent to the home, and in fact an extension of the structure of the home itself, providing an inference that the porch should be treated as an adjunct of the house. Although curtilage cannot be measured "by a tape measure comparison," *Redmon*, 138 F.3d at 1112, this factor does weigh in favor of the porch being curtilage. *See French*, 291 F.3d at 952 ("While it is true that we have found that privacy expectations are most heightened when the area in question is nearer (within 20 feet) to the home, the proximity to the home, standing by itself, does not per se, suffice to establish an area as within the curtilage.")

*Second*, not only is the entire front yard set off by a chain-link fence, but the porch is also separately set apart from the yard by five steps and a railing. While neither fence nor railing provide privacy from curious eyes, and without locks on the gates, the fence would not prevent anyone from coming onto the property, the enclosure of the area itself supports an inference of association with the home. *See Bleavins v. Bartels*, 422 F.3d 445, 452 (7th Cir. 2005) ("[T]he internal fence 'serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house . . . .'" (quoting *Dunn*, 480 U.S. at 302)).

*Third*, the presence of a children's play area (which was, in fact, used by Peter's girlfriend's child) indicates that the porch was used as a play area for young children. On the other hand, the walkway and the porch are used by the mailman and other deliverymen, and

might be used by any member of the public to contact a resident. While the inference from the third factor is mixed, an implied invitation to the public need not necessarily exclude activities intimately associated with the home. *See Palmieri v. Lynch*, 392 F.3d 73, 93 & n. 14 (2d Cir. 2004) (finding an area to be curtilage because, among other things, it was strewn with children's toys and "other items of a domestic nature").

*Fourth*, Peter did little or nothing to protect the porch from observation by anyone standing in the street or approaching the front door. The chain link fence—which was already in place when Peter moved into the residence—appears designed to keep children or animals in the yard, not to prevent persons from observing (or smelling) what was on the porch.

While the last factor clearly supports an inference that the porch is not curtilage and casts doubt on Peter's expectation of *privacy* in the front porch, the first two factors strongly suggest that the porch was within the curtilage. And while the third factor is mixed, the fact that children's toys were visible on the porch signals that the area was intimately associated with the home and subject to Fourth Amendment protection. Thus, although close, the Court concludes that the front porch was within the curtilage of the home because it was attached to the living area, enclosed within a fence, and used by members of the household for residential purposes.

**D.      The trespass to conduct a dog sniff did not violate the Fourth Amendment.**

Having thus concluded that the police intrusion onto Peter's front porch was a trespass within the curtilage of his dwelling, and therefore a constitutionally significant search, the final question is whether the police were required to obtain a search warrant before coming onto the property. Generally, a search of a residence is unreasonable unless done pursuant to a search warrant. *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995). But not every search requires a warrant: police routinely perform protective sweeps of a home and search persons and

25

their effects incident to arrest. And even where such exigent circumstances do not exist, the Seventh Circuit has long maintained that not *every* search or seizure requires a warrant and that in some cases it is appropriate to apply a "sliding scale": "How much cause agents need to do something depends on how deeply they invade the zone of privacy." *United States v. Concepcion*, 942 F.2d 1170, 1173 (7th Cir. 1991).

In *Concepcion*, the court acknowledged that inserting and turning a key in a lock in order to determine whether an apartment belonged to a recent arrestee was a "search" under the Fourth Amendment because it obtained private information—under *Jones* the mere invasion of the property interest would suffice—but that no probable cause or warrant was necessary for such a minimal invasion *Id.* at 1772.Further, the curtilage—or even the front door—of a residence is not immune from the sliding scale: in *Brown*, the court approved a limited warrantless entry into an apartment—just enough to peak into each room—based on vague concerns about the safety of the resident, though there was no signs of immediate danger. 64 F.3d at 1086–87. Citing *Concepcion*, the court held: "The less intrusive a search, the less justification is required. This is true not only of street stops, but also of residential searches." *Id.* at 1086 (internal citations omitted). And recently, in *United States v. Flores-Lopez*, 670 F.3d 803, 807 (7th Cir. 2012)—one of the few post-*Jones* Fourth Amendment decisions from the Seventh Circuit—the court noted that although accessing a cell phone to determine its telephone number is a Fourth Amendment search, it is such a minimal invasion that no warrant is required, even in the absence of any exigent circumstances. Moreover, *Flores-Lopez* specifically held that *Concepcion* survived *Jones,* which means that the "sliding scale" approach may allow minimally invasive intrusion on property interests, not merely privacy interests.

While there are obvious differences between this case and the precedent cases, the basic

principle still applies and the intrusion in this case was so minimal that it could be justified without a warrant and upon less than probable cause. The search was minimal in two separate ways. First, the search only marginally encroached on Peter's property interest, which interest was substantially curtailed in his porch due to the fact that it was impliedly open to any social or business invitee seeking to contact a resident. Because a dog sniff is not a search, the police could have brought Hondo with them to the door without any additional justification while they were there on legitimate business—whether to arrest Peter or to check and see if there was anyone else home.  Second, the investigation conducted on the property was barely intrusive, if at all. The officers did not peer into doors and windows or listen or smell at cracks: the only information revealed by the dog sniff was whether there was a lingering smell of narcotics on the porch, and (as discussed above) the precedent is clear that there is no cognizable Fourth Amendment privacy interest (or presumably property interest) in the presence or absence of narcotics. Because of the especially minimal nature of the Fourth Amendment trespass in this case, the officers did not need a warrant to bring a drug-sniffing dog onto Peter's porch.

While the police did not need a warrant or probable cause, their trespass does implicate the Fourth Amendment, albeit only marginally, and thus needed *some* suspicion to justify their intrusion. Otherwise, there would be nothing to prevent law enforcement from canvassing a neighborhood with drug dogs and going from door to door to hunt out narcotics without any justification. The Court is aware of no other decision approving the blanket application of such tactics, which seem contrary to principles underlying the Fourth Amendment. But there is no occasion here to consider under what circumstances the police could conduct a general sweep of a neighborhood for odors of narcotics because the officers in this case had sufficient reason to suspect that Peters might have been growing marijuana. Peter's "strange" behavior at the garden

store apparently raised enough suspicion of an indoor marijuana grow operation to cause Trooper Ringer to run his license plate and discover an outstanding arrest warrant. And then, when Trooper Hoffman executed the warrant weeks later, he noticed other facts which tended to confirm Ringer's suspicions: covered windows on all three floors, a metal mesh vent over a portion of a basement window, and the sound of fans running in the basement through the vent. Further, when Officer Hoffman asked about a marijuana grow operation, he noticed that Peter became "more agitated and defiant." *See* DE 28-2 at 12. While these observations, standing alone, may not amount to probable cause, they were enough to justify the minimally invasive next step of bringing a dog up a publically accessible walk to sniff for the presence of illegal narcotics.[5]

**E.     The Search Warrant Properly Included the Garage in the Premises to be Searched**

Lastly, Peter argues that even if the dog sniff was lawful, it did not justify the broad scope of the search warrant, which authorized police to search the garage as well as the house. He points out that the affidavit did not mention any suspicion that there was marijuana growing in the garage, nor any facts that could support probable cause to search the garage. In fact, he argues, because the affidavit both claims that Hondo was 100 percent accurate and that it did *not* alert to the garage, despite sniffing along its edge, the dog's sniff activity could not support a warrant to search the garage.

There is no merit to this argument. When reviewing a judicial officer's initial finding of probable cause to support a search warrant, the Court "gives 'great deference' to the issuing

---

[5]Further, although not mentioned by the government, the police may have had an additional justification for searching for marijuana: by asking Peter directly about a marijuana grow operation, they tipped their hand about their suspicions. How much time did the officers have before Peter or an associate returned to the residence to remove any trace of the grow operation?

judge's determination so long as the judge had a 'substantial basis' for the finding." *United States v. Miller*, 673 F.3d 688, 692–93 (2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). To begin with, Peter points to no authority for his argument that the affidavit needed to specifically identify probable cause that there were drugs in the garage in order for the judicial officer to include the garage in the premises to be search. Moreover, his argument is undermined by Seventh Circuit precedent. In *United States v. Griffin*, 827 F.2d 1108 (7th Cir. 1987), the court upheld a search of a garage, toolshed, and parked car, for narcotics on the basis of a warrant that described the house and garage. *Id.* at 1110. The court held that "[a] lawful search of fixed premises generally extends to every part of the premises in which the object of the search may be found." *Id.* at 1114. Further, in *United States v. Evans*, 92 F.3d 540 (7th Cir. 1996), the court held that because the police had reason to believe (enough to obtain a warrant) that the defendant was involved in the drug trade and used the house as a crack house, "it was reasonable for them to suppose that his use of the property might extend to the garage . . . and that either the house or the garage might contain contraband or evidence of crime." *Id.* at 543.

In this case, the fact that the dog sniff alerted on the residence, along with other clues that Peter was conducting a marijuana grow operation, created a fair probability that the residence contained evidence of marijuana manufacture. And since there was certainly reason to suspect the house, it was only logical for the judicial officer to suppose that the marijuana grow operation may extend to the garage. Peter's claim that the lack of an alert on the garage undermined any probable cause that evidence of marijuana would be found in the garage is not supported by the record. Trooper Dockery explained that Hondo did, in fact, show signs that there were drugs in the garage, but did not alert to the garage because Trooper Dockery did not permit it. Further, the claim that Hondo was 100 percent accurate would not be inconsistent with

a failure to alert on an area where there were actually drugs. Hondo's perfect accuracy meant that every time he had alerted in the past, drugs had been found. But the inverse—that Hondo's failure to alert demonstrates that there are no drugs—does not follow. Based on these circumstances, the judicial officer who issued the search warrant had a substantial basis to include the garage in the premises to be search.

Finally, even if the inclusion of the garage in the warrant were not, in fact, supported by probable cause, "the evidence seized in executing the warrant should not be suppressed if the police officers relied in good faith on the judge's decision to issue a warrant." *Miller*, 673 F.3d at 693 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)). Trooper Hoffman's decision to obtain a warrant is *prima facie* evidence of that he was acting in good faith, but Peter could defeat this presumption with evidence that: (1) the judicial officer abandoned her detached and neutral judicial role; (2) Trooper Hoffman was dishonest or reckless in preparing his affidavit; or (3) that the warrant was so lacking in probable cause that the officers could not reasonably rely on it. *Id.* There is no evidence of any of these alternatives. There is no indication that the judge rubber-stamped the affidavit or that Trooper Hoffman was dishonest or reckless. And as discussed above, circuit precedent tends to support searches of outbuildings based on evidence of drug activity in the residence. Even if, for some reason, the facts in the affidavit fell short of the probable cause threshold, it was not so far short that the officers could not have reasonably relied on the judge's finding of probable cause.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the police were lawfully present on Peter's front porch. No warrant was necessary for the dog sniff or the minimal intrusion onto Peter's property, and there was adequate suspicion of criminal activity to justify the search.

Further, the search warrant properly included the garage within the premises to be search.

Therefore, the Court **DENIES** the Defendant's motion to suppress [DE 15].

      SO ORDERED.

      ENTERED:   May 24, 2012

                                          /s/ JON E. DEGUILIO
                                     Judge
                                     United States District Court